509 So.2d 210 (1987)
MISSISSIPPI STATE BAR
v.
Stanford YOUNG.
No. 162.
Supreme Court of Mississippi.
June 10, 1987.
Andrew J. Kilpatrick, Jr., Jackson, for appellant.
David Slaughter, Waynesboro, William Roberts Wilson, Jr., Pascagoula, James W. Nobles, Jr., Jackson, C.R. McRae, Pascagoula, for appellee.
En Banc.
ROBERTSON, Justice, for the Court:

I.
Today we are presented a demand by the Mississippi State Bar that an able and experienced attorney, many years a member of the bar, be stripped of his license to practice law. The primary predicate of the *211 demand is the action of a federal appeals court finding the attorney guilty of unprofessional conduct and suspending him from practice before its bar for a year.
We have considered the matter carefully and at length. By reason of our rules regarding reciprocal discipline, our respect for the findings of the court of appeals, and our independent examination of the sworn testimony of the attorney, and for the reasons set forth below, we order the attorney's license to practice law suspended for a period of one year.

II.
On January 27, 1984, the Mississippi State Bar (MSB) filed before a Complaint Tribunal of this Court a formal complaint seeking the disbarment of Stanford Young, an attorney who for many years has maintained an office in Waynesboro, Mississippi. Young was charged with unprofessional and unethical conduct because of his participation in a scheme to bribe former State Bank Comptroller James H. Means.
It appears that on July 20, 1981, Means and an associate of his, Edgar C. Lloyd, Jr., were convicted in the United States District Court of the Southern District of Mississippi of mail fraud, fraud by wire, and aiding and abetting. On January 3, 1983, the United States Court of Appeals for the Fifth Circuit affirmed. United States v. Means, 695 F.2d 811 (5th Cir.1983). Though a participant in the transaction, Young appeared at the trial of Means and Lloyd as a witness for the prosecution.
After its affirmance and upon the basis of Young's testimony at the Means-Lloyd trial, the Court of Appeals found Young guilty of conduct "unbecoming a member [of the bar] of this Court" and suspended him from practice there for a period of one year. Certification of Young's suspension by the Court of Appeals has been lodged here, as a result of which MSB in Count One of its formal complaint urges that Young's guilt of unprofessional conduct has been conclusively established. Miss. Code Ann. § 73-3-341 (Supp. 1984); Rule 13, Rules of Discipline, MSB, effective January 1, 1984. A copy of the Order and Opinion of the Court of Appeals is attached as an Appendix to this opinion.
Count Two of the formal complaint goes to the underlying conduct which has given rise to the suspension by the Court of Appeals and charges Young with bribing or attempting to bribe a state official and perjuring himself before a grand jury in relation to those bribes.
The basis of the bribery complaint was that Young had been hired by incorporators to assist in obtaining a charter to operate a new bank in Moss Point, Mississippi, to be known as the Singing River Bank. During the course of attempting to obtain this charter, Young allegedly entered into an agreement with Lloyd by which Lloyd would purchase $50,000.00 in Singing River Bank stock with the understanding that the new bank would buy the stock back within two years for $100,000.00  for a net profit to Lloyd of $50,000.00  in return for Lloyd's influence with Comptroller Means for the charter's issue. Means was a "participant" in this arrangement. See United States v. Means, 695 F.2d at 815.
Young accepted this deal on the part of the incorporators and on October 10, 1974, on recommendation of Means, the banking board issued certification to authorize incorporation. On July 14, 1975, Lloyd purchased $50,000.00 in Singing River Bank stock. After taking care of Lloyd's indebtedness arising from his stock purchase loan  all at no cost to Lloyd, Young, on December 9, 1976, delivered to Lloyd a cashier's check for $39,126.80, the net proceeds from the repurchase from Lloyd of the Singing River Bank stock. United States v. Means, 695 F.2d at 813-14. Lloyd and Means then split their loot. United States v. Means, 695 F.2d at 815.
Young was summoned to testify before a federal grand jury investigating possible influence peddling by Lloyd and Means in the issuance of the bank charter. According to the formal complaint, Young provided false information to the grand jury regarding his dealings with Lloyd in the procurement of the Singing River Bank charter at the first hearing and was given an *212 opportunity to reappear before the grand jury and recant. In his testimony at the trial of Lloyd and Means, again, according to the formal complaint (and according to the opinion issued by the Fifth Circuit), Young admitted giving false testimony before the grand jury in his first appearance.
MSB's January 27, 1984 complaint was not the first occasion upon which disciplinary action against Young was sought arising out of the Singing River Bank affair. On September 17, 1981, prior to the Means-Lloyd trial, a complaint, No. 81-48-1, was filed alleging that Young had bribed or brought influence and had perjured himself before the grand jury. Young filed a motion seeking dismissal of the complaint. The complaint was dismissed by the Committee on Complaints by letter dated May 20, 1982. No investigatory hearing was held on the matter.
MSB, in the case at bar, alleges that the original complaint was dismissed in part because of misleading information filed by Young with its Committee on Complaints. Another reason for the dismissal was inability to obtain transcripts of the grand jury proceedings because of appeals underway.
When the Court of Appeals issued its written opinions affirming the Lloyd and Means conviction and suspending Young from practice before its bar, MSB filed a second formal complaint, No. 83-16-1, the complaint before us this day. Young answered arguing as affirmative defenses res judicata, collateral estoppel, double jeopardy, equitable estoppel, unconstitutional denial of aue process, statute of limitations and violation of confidentiality. A motion was filed by Young similarly asking for dismissal of the formal complaint on grounds of res judicata, collateral estoppel and statute of limitations.
A Supreme Court Complaint Tribunal was duly constituted to hear Young's motion to dismiss the second complaint. On August 30, 1984, the Tribunal sustained Young's motion to dismiss announcing its view that the proceedings upon Complaint No. 83-16-1 offended the double jeopardy provisions of Article 3, Section 22 of the Mississippi Constitution and of the Fifth and Fourteenth Amendments of the United States Constitution. The Tribunal further found that collateral estoppel prevented the presentation of any evidence on issues present in the first complaint.
MSB has now appealed to this Court, see Miss. Code Ann. § 73-3-329(3) (Supp. 1984), as supplanted by Rule 9, Rules of Discipline, MSB, requesting a de novo review and that upon Count One of its Complaint, Young be disbarred.

III.

A.
The Mississippi State Bar charges as error the ruling of the Complaint Tribunal that the present proceedings against Young are precluded under the double jeopardy clauses of state and federal constitutions. Here, of course, the Tribunal proceeded with reference to the May 20, 1982 dismissal of Case No. 81-48-1 by the MSB Complaints Committee.
It is certainly true that we have heretofore considered bar disciplinary proceedings inherently adversary and of a quasi-criminal nature and have labeled them as such. Attorney K v. Mississippi State Bar Association, 491 So.2d 220, 222 (Miss. 1986); Levi v. Mississippi State Bar, 436 So.2d 781, 783 (Miss. 1983); see also In Re Ruffalo, 390 U.S. 544, 551, 88 S.Ct. 1222, 1226, 20 L.Ed.2d 117, 122 (1968). We have repeatedly held that attorneys who are accused in bar disciplinary proceedings have the right to due process of law, Attorney K. v. Mississippi State Bar Association, 491 So.2d 220, 222 (Miss. 1986); Myers v. Mississippi State Bar, 480 So.2d 1080, 1087 (Miss. 1985); Netterville v. Mississippi State Bar, 397 So.2d 878, 883-84 (Miss. 1981), although it is not at all clear that attorneys would be without this right if disciplinary proceedings were regarded as wholly civil in nature. On the other hand there are among the procedural trappings normally attendant upon a criminal trial numerous "rights" which have no place in bar disciplinary proceedings. For one thing, the attorney has no right to trial by *213 jury. For another, the attorney's "guilt" need not be established beyond a reasonable doubt, as in criminal cases, see Jackson v. Virginia, 443 U.S. 307, 309, 99 S.Ct. 2781, 2783, 61 L.Ed.2d 560, 567 (1979), but may be established by that lesser quantum of proof we label "clear and convincing evidence." Brumfield v. Mississippi State Bar, 497 So.2d 800, 807 (Miss. 1986); Levi v. Mississippi State Bar, 436 So.2d 781, 783-84 (Miss. 1983).
Whether double jeopardy rights attach in bar disciplinary proceedings is a question we have never decided, nor do we provide an answer today.[1] For assuming, *214 without deciding, that the criminal mode of proceedings applies here, the Tribunal nevertheless was in error. We have nothing before us which suggests that the dismissal of the complaint in Case No. 81-48-1 was a dismissal on the merits or, more precisely, was a dismissal after jeopardy had attached. The earlier proceedings were before the MSB Committee on Complaints. No investigatory hearing was ever held.
By analogy to the criminal process, the Committee on Complaints functions somewhat as a grand jury. Clark v. Mississippi State Bar Association, 471 So.2d 352, 357 (Miss. 1985). The dismissal of the complaint in No. 81-48-1 occurred at a preliminary inquiry stage, the functional equivalent of a grand jury's refusal to indict, if not a magistrate's refusal to bind a defendant over to await action of the next grand jury.
We entertain serious doubts that double jeopardy protections apply at all in bar disciplinary proceedings  for the reasons enumerated in the many cases cited in footnote 1 above  although today's decision should not be taken as the final word on the point. Assuming arguendo that the double jeopardy clauses do apply, we hold that dismissal of the complaint in Case No. 81-48-1 was at a stage sufficiently early that prosecution of the new complaint No. 83-16-1 would violate no double jeopardy rights.

B.
In the alternative, the Complaint Tribunal invoked the doctrines of res judicata and collateral estoppel and held proceedings under the present complaint precluded. On appeal the MSB assigns this as error. We agree.
The Tribunal determined that it would "... not permit petitioner (Mississippi State Bar) to rehash or relitigate matters and issues or present the same evidence, in being, at the disposal of petitioner, when the former complaint against respondent was considered in Cause No. 81-48-1, ... . It is the collective opinion of the Tribunal that the doctrine of collateral estoppel prevents the Mississippi State Bar from presenting evidence, as previously mentioned, when the complaint now under consideration is considered in a quasi-civil view."
It is not at all clear whether, or to what extent, collateral estoppel has application in bar disciplinary proceedings. See Levi v. Mississippi State Bar, 436 So.2d 781, 787 n. 1 (Miss. 1983). Where it does apply, however, collateral estoppel has reference to findings of fact necessary to a prior judgment on the merits. No issue is precluded from further litigation unless it has been actually determined adversely to the party seeking relitigation and unless that determination was essential to a final judgment. Welborn v. Lowe, 504 So.2d 205, 207 (Miss. 1987); In Interest of K.M.G. v. Parson, 500 So.2d 994, 997 (Miss. 1987); Ingalls Shipbuilding Division v. Parson, 495 So.2d 461, 463 (Miss. 1986); Mississippi Employment Security Commission v. Philadelphia Municipal Separate School District, 437 So.2d 388, 395-96 (Miss. 1983); Sanders v. State, 429 So.2d 245, 251 (Miss. 1983); Garraway v. Retail Credit Co., 244 Miss. 376, 385, 141 So.2d 727, 730 (1962). Here, as indicated above, there was no final judgment entered by the Complaints Committee or by anyone else on the merits of Complaint No. 81-48-1.
This question has been before the Court in a very analogous procedural and factual context in the case of Clark v. Mississippi State Bar Association, 471 So.2d 352 (Miss. 1985), wherein we said
Likewise, the issue of res judicata is raised by Appellant. He asserts that the dismissal of the first complaint by the Mississippi State Bar Committee on Complaints contains some of the same allegations as the subsequent complaint. Therefore, Appellant contends that the first dismissal renders the second charge res judicata. This Court disagrees for *215 the reason that the decision by the Committee on Complaints is not a judicial determination on the merits, but rather is analogous to a review by a grand jury. Miss. Code Ann. § 73-3-303, 73-3-309, 73-3-311, 73-3-319 (Supp. 1984). On the other hand, the Complaint Tribunal `in many ways has acted as a trial court sitting without a jury'. Levi v. Mississippi State Bar, 436 So.2d 781 (Miss. 1983).
471 So.2d at 357.
Other states appear to take a like view of bar disciplinary or grievance committee actions declining to institute disciplinary action against an attorney. See Louisiana State Bar Association v. Ponder, 340 So.2d 134 (La. 1976); Matter of Bannister, 86 Wash.2d 176, 543 P.2d 237 (1975); State v. Sewell, 487 S.W.2d 716, 718 (Texas 1972); Karlin v. Culkin, 248 N.Y. 465, 162 N.E. 487, 60 A.L.R. 851 (1928).
Without further ado, we hold that MSB's Assignment of Error No. 1 has merit. The August 30, 1984, decision of the Complaint Tribunal is vacated and held for naught.

IV.

A.
We have considered whether this entire matter should now be referred back to the Complaint Tribunal for hearing on its merits. If all the MSB complaint sought was adjudication ab initio regarding Young's participation in the Lloyd-Means bribery and influence peddling scheme, we would no doubt follow this course. Count One of the complaint, however, is ripe for adjudication on its merits today. This is the count which, as explained more fully elsewhere herein, proceeds under the authority of Miss. Code Ann. § 73-3-341 (Supp. 1984) and Rule 13, Rules of Discipline, MSB, and relies upon the findings of the federal courts as "conclusive evidence" of Young's guilt of "the offense or unprofessional conduct."

B.
Our legal authority and responsibility emanate from Section 73-3-341/Rule 13, and as well our inherent authority in bar disciplinary matters. Our confidence that we correctly exercise that authority is augmented by our study of the testimony given by Young under oath before the United States District Court for the Southern District of Mississippi in the trial of Means and Lloyd and at his show cause hearing before the Court of Appeals. To be sure, we recognize and respect the findings made by the Court of Appeals on two separate occasions. See United States v. Means, 695 F.2d 811, 813-14 (Miss. 1983); In Re Young, Unreported Memorandum Opinion released May 16, 1983. In the end we credit no fact with respect to which we are without an acknowledgment by Young.
At the risk of repetition, the facts before us are these: In October of 1974 Young was engaged in his professional capacity as an attorney to represent the incorporators who were seeking a charter for the Singing River Bank in Moss Point, Mississippi. The incorporators had filed an application with the Mississippi State Banking Board in October of 1973. A year later approval still had not been obtained and at this point Young was employed to represent the incorporators.
In October of 1974 the application for incorporation was presented to the five member state banking board at a three day adversary hearing. During the time of this hearing Young was approached by Edgar C. Lloyd who was known by Young to be a friend of James H. Means, State Bank Comptroller. Young and Lloyd met and talked at the Sun 'n Sand Motel in Jackson, Mississippi, on the evening of October 8, 1974. According to Young, Lloyd advised that he was in a position to help get the bank charter and, more to the point, that without Lloyd's help the Singing River Bank would never receive a charter. Lloyd offered to use his influence with Means if the incorporators of the bank would agree to a stock sale/repurchase agreement with Lloyd. Specifically, Lloyd asked that he be allowed to purchase $50,000.00 worth of stock in Singing River Bank subject to the firm agreement that the stock would be repurchased from Lloyd within two years *216 for $100,000.00. The net effect of this proposal, of course, was that Lloyd would make a $50,000.00 profit at the time of repurchase.
Young reported Lloyd's offer to the incorporators, all of whom were in Jackson for the hearing and were also staying at the Sun 'n Sand Motel. On October 10, 1974, Young advised Lloyd that the Singing River Bank would accept his proposal. On October 24, 1974, Means signed the authorization for issuance of the charter to Singing River Bank.
Means had an interest in the proposition Lloyd made to Young and Young knew it. When asked about this at the Means-Lloyd trial, Young replied: "... how else could he have helped us if he [Means] didn't have an interest... . I knew he had an interest or he couldn't help us."
At the show cause hearing before the Court of Appeals,
Young, himself, told the Court, "I did extremely wrong there." Counsel further admitted that Young knew that Means would receive some advantage from the scheme with Lloyd.
Before this Court Young makes much of the said-to-be-fact that Means had given his approval to the SRB charter application on February 22, 1974  almost eight months before the Young-Lloyd meeting. The fact remains that Young and the SRB incorporators had no knowledge of this fact, if it be a fact. Moreover, the final charter approval was not publicly announced until shortly after the Young-Lloyd deal. In this context, Young profits nothing from the fact that Means may have approved the charter and sat on it until he got assurance of his cut from the deal Lloyd would strike.
In any event, in July of 1975 shares of stock in the Singing River Bank were being sold at $10.00 per share. Five thousand shares were sold to Lloyd, with 2500 being placed in his name and the remaining 2500 in his wife's name. Lloyd had borrowed the $50,000.00 with which to make the stock purchase in a transaction with which Young had no apparent involvement. In 1976, however, Lloyd's $50,000.00 loan came due and he made demand upon Young for the $100,000.00 pursuant to the repurchase agreement. Instead, Young arranged to move Lloyd's loan to the Southern National Bank in Birmingham, Alabama. Specifically, Young arranged for the Alabama bank to loan Lloyd $60,000.00 which enabled Lloyd to pay off his original $50,000.00 loan with interest, plus other indebtedness. Lloyd's SRB stock was pledged as collateral at the Alabama bank for this new loan.
A few months later, Lloyd again contacted Young and asked that the stock repurchase agreement be carried out. In December of 1976 Young made the necessary arrangements for this to be done. By this time Young had acquired a controlling interest in the Singing River Bank. In December of 1976 Young arranged for a co-stockholder at SRB to go to the Southern National Bank in Birmingham to borrow the $100,000.00 necessary to repurchase Lloyd's stock. That loan was obtained and out of its proceeds Lloyd's $60,000.00 note at the Southern National Bank was paid with interest and the Lloyd note was cancelled. On December 9, 1976, Young delivered to Lloyd in Jackson, Mississippi, a cashier's check for $39,126.80, representing the balance owing to Lloyd after repayment of Lloyd's indebtednesses incident to the stock purchase. Lloyd and Means then split the proceeds of this check. See United States v. Means, 695 F.2d at 815. Effective December 9, 1976, Young and the Singing River Bank had performed fully the terms of their agreement with Lloyd.

C.
The facts recited herein have been "found" by the United States Court of Appeals for the Fifth Circuit and employed by that Court as a basis for imposition of disciplinary sanctions against Young. See the recitation of facts contained in the Means opinion, see United States v. Means, 695 F.2d 811, 813-15 (5th Cir.1983), released January 3, 1983. Fifteen days thereafter, on January 18, 1983, the Court of Appeals issued to Young an order to show cause why he should not be disbarred from practice before that court "because of *217 his actions disclosed in the record on appeal" in the Means case. Young filed a written response there and a hearing was held before the Court of Appeals on April 27, 1983. On May 16, 1983, the Court of Appeals found that Young had engaged in "conduct unbecoming a member of the bar," Rule 46(c), F.R.App.P., and suspended Young from practice before the Court of Appeals for a period of one year.
Miss. Code Ann. § 73-3-341 (Supp. 1984), effective at the time of the action of the Court of Appeals, provides a procedure for discipline in this state of an attorney who has been subjected to disciplinary sanctions in another jurisdiction. The rule provides that certification of the sanction by the appropriate authority of the foreign jurisdiction
shall be conclusive evidence of the guilt of the offense or unprofessional conduct on which said sanction was ordered, and it will not be necessary to prove the grounds for such offense in the disciplinary proceedings in this state.[2]
This is not the first time we have been called upon in the context of a bar disciplinary matter to give credence to the proceedings in the courts of another jurisdiction. In Mississippi State Bar v. Phillips, 385 So.2d 943 (Miss. 1980) the Court had before it an attorney who had been convicted of a felony in the United States District Court for the Southern District of New York, a conviction which had been affirmed by the United States Court of Appeals for the Second Circuit. We there ordered that the attorney be disbarred, noting that
We are bound to give full faith and credit to judgments of our sister states and the federal system, even to the recitation of facts in decisions of their appellate courts.
385 So.2d at 945.
Rule 13, which was adopted by order of this Court and/or Section 73-3-341, the now superseded enactment of the Mississippi Legislature, are to the same effect. We have only recently enforced the provisions of Disciplinary Rule 6(a) to the effect that a judgment of conviction in a federal court a certified copy of which is filed with this Court is respected here. In Mississippi State Bar v. Nixon, 494 So.2d 1388 (Miss. 1986) we stated
Both Rule 6(a) and elementary notions of full faith and credit require acceptance here of the validity and propriety of that judgment.
494 So.2d at 1389. See also Holmes v. Mississippi State Bar, 498 So.2d 837, 841 (Miss. 1986).
Like Rule 6(a) which we enforced in the Nixon and Holmes cases, Rule 13 also provides that a certified copy of the judgment of the court of the other jurisdiction shall be "conclusive evidence" of the attorney's guilt of the offense.
Notwithstanding the foregoing, the MSB seems to concede that it would nevertheless be appropriate for us to look behind the proceedings before the United States Court of Appeals for the Fifth Circuit to be sure that Young was there accorded due process and that the evidence there was indeed sufficient to support the findings there made. See In Re Dawson, 609 F.2d 1139, 1142 (5th Cir.1980). When we do this, and we have examined the transcript of Young's testimony before the United States District Court for the Southern District of Mississippi, as well as the proceedings before the United States Court of Appeals for the Fifth Circuit, we find no credible basis for doubting the fairness and propriety of the proceedings and action of the Court of Appeals.
We emphasize that this is a case where the material facts are not in dispute. Though Rule 13/Section 73-3-341 direct that we take the Court of Appeals' findings as "exclusive evidence of the guilt" of Young, we have, nevertheless, taking our cue from the brief of the Mississippi State Bar and its citation of the Dawson case, *218 conducted our customary independent survey of the facts. See Brumfield v. Mississippi State Bar, 497 So.2d 800, 806 (Miss. 1986); Mississippi State Bar Association v. Strickland, 492 So.2d 567, 571 (Miss. 1986); Clark v. Mississippi State Bar Association, 471 So.2d 352, 357 (Miss. 1985); Levi v. Mississippi State Bar Association, 436 So.2d 781, 782 (Miss. 1983). This done, we find, not only by clear and convincing evidence, but beyond all reasonable doubt, that, while representing the proposed incorporators of the Singing River Bank, Stanford Young made and entered into an agreement with Edgar C. Lloyd whereunder Lloyd was to exercise his influence with Comptroller Means to secure the bank charter, that Young understood that without Lloyd's influence the charter could not be obtained, that Young reported the agreement to no one other than the incorporators of the bank, and that Young took an active part in carrying out the agreement with Lloyd. Such conduct is, by virtue of the interstate connection involvement of the Southern National Bank in Birmingham, made criminal by federal law. Indeed, it is apparent that Young was subject to prosecution the same as Lloyd and Means for federal mail fraud, 18 U.S.C. § 1341, fraud by wire, 18 U.S.C. § 1343, and aiding and abetting, 18 U.S.C. § 2, if not conspiracy as well.[3]See United States v. Means, 695 F.2d 811 (5th Cir.1983). Such conduct is also unlawful under our state law proscribing offers of inducements to influence public officials' actions in the accomplishment of official acts, Miss. Code Ann. § 97-11-11 (Supp. 1985); if not bribery, Miss. Code Ann. § 97-11-11 (1972).[4]
In sum, we hold that MSB's Assignment of Error No. 2 has merit and that the Complaint Tribunal erred in dismissing Count One of MSB's formal complaint. Further, we find today's record more than adequate that we may determine with confidence that Count One  the Rule 13/Section 73-3-341 count  has merit and that Stanford Young has committed offense against the Disciplinary Rules of the Mississippi State Bar.[5]

D.
Having found Young guilty of an "offense or unprofessional conduct" by virtue of the action of the United States Court of Appeals for the Fifth Circuit, we turn to the matter of disposition. Rule 13/Section 73-3-341 instruct us that in cases such as this

*219 the sole issue to be determined ... shall be the extent of the final discipline to be imposed on said attorney, which may be less or more severe than the discipline imposed by the other jurisdiction.
The Court of Appeals suspended Young from practice before its bar for a period of one year. MSB, however, urges that we enter final judgment here disbarring Young from the practice of law in this state.
In ascertaining the appropriate sanction in this case, we find inescapable our duty of individualized sentencing. We consider the gravity of Young's offense, on its own, and then compare other similar cases, together with a broad range of other individualized facts and circumstances regarding Young's life and past service to the bar, all to the end that today's sanction may both fit Young's offense and be consistent with the sanctions we have imposed in other similar cases.
From the first point of view, we find it inescapable that Young's conduct was a violation of several criminal statutes, federal and state. It appears that, had he not "recanted" his prior grand jury testimony and agreed to appear as a witness for the prosecution, Young would have been criminally liable in the federal courts not unlike Means and Lloyd. Such culpability is substantial. On the other hand, this is our first case under Rule 13. All of our prior cases premised upon findings of courts of other jurisdictions have been under Rule 6. In each of those cases the attorney has been finally convicted of a crime. Mississippi State Bar presents no such conviction today.
The Court of Appeals has set somewhat of a precedent in this matter by its one year suspension. While we are in no way obligated to follow suit and indeed have authority to order disbarment, we recognize in this case a certain precedential force in the sanction imposed by the Court of Appeals. Moreover, we are quite familiar with Young's many years of service to the bar.
Considering these matters, including Young's age, 63, and the fact that this is his first offense, we have determined that the appropriate sanction, under the totality of the circumstances of this case, is a one year suspension.
The practice of law is a privilege, not a property right, and a revocable privilege at that. Levi v. Mississippi State Bar, 436 So.2d 781, 786 (Miss. 1983). In the exercise of that privilege, the lawyer necessarily claims for himself special exemptions from rules of behavior applicable to everyone else. See Robertson, J., The Lawyer As Hero 53 Miss.L.J. 431, 437-41 (1983). The quid pro quo the lawyer must give includes stern resistance to the temptation to rationalize into a "legitimate business deal" what to any objective observer is an agreement to pay substantial money to the end that a public official may discharge his duties without regard to the merits of the matter at hand. We, therefore, order that Stanford Young's license to practice law in the State of Mississippi be, and it hereby is, suspended for a period of one year from the date this decision becomes final.[6]
ORDER OF COMPLAINT TRIBUNAL REVERSED; ATTORNEY'S LICENSE TO PRACTICE LAW SUSPENDED FOR PERIOD OF ONE YEAR.
ROY NOBLE LEE and HAWKINS, P.JJ., and DAN M. LEE, PRATHER, ANDERSON and GRIFFIN, JJ., concur.
HAWKINS, P.J., specially concurs by separate written opinion joined by DAN M. LEE and GRIFFIN, JJ.
WALKER, C.J., and SULLIVAN, J., not participating.

EXHIBIT 2

IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

IN THE MATTER OF:

STANFORD YOUNG

May 16, 1983

OPINION and ORDER
Before: REAVLEY, RANDALL, and GARWOOD, Circuit Judges.
*220 PER CURIAM:
On January 18, 1983, Chief Judge Clark issued to Stanford Young an order to show cause why he should not be disbarred as a member of the Bar of this Court because of his actions disclosed in the record on appeal in U.S. v. Means, 695 F.2d 811 (5th Cir.1983). Young, by counsel, filed a written response to the order, setting forth his position. Young also requested a hearing before this Court.
The matter came before this panel for a hearing on April 27, 1983. At the hearing, the Court read portions of the trial testimony of Young on behalf of the Government in the prosecution of James H. Means, the former Bank Comptroller of the State of Mississippi, and Edgar C. Lloyd, for mail fraud and fraud by wire. Young's testimony established that he participated in a scheme to bribe Means.
In 1974, Young was an attorney for a group of persons seeking a bank charter for a new bank. Lloyd approached Young during the hearing before the Bank Comptroller and told him he was a friend of the Comptroller. Lloyd also told Young that without his help Young and his group would not receive the charter. Young agreed to a scheme whereby the investors would sell stock to Lloyd for $50,000 and buy it back within two years for $100,000, which would net Lloyd $50,000, to influence Means to approve the bank charter. With Young's continued involvement, the scheme was carried out substantially as agreed.
The transcript of the Means case also established that Young's testimony at his first appearance before the grand jury investigating the Means case was less than the whole truth. At a second appearance before the same grand jury, Young recanted his previous testimony and told the whole truth, or as Young put it at the Means trial, he told "the facts as they really were."
At the hearing, both Young and his counsel spoke on Young's behalf. Counsel for Young admitted to the Court that Young's conduct was not "commensurate with that high standard that an attorney is burdened with when he becomes a member of the bar of any court," and that Young's conduct was "unbecoming a member of this Court." Young, himself, told the Court, "I did extremely wrong there." Counsel further admitted that Young knew that Means would receive some advantage from the scheme with Lloyd. Counsel also admitted that Young's testimony at his first grand jury appearance differed on substantial matters from that at his second appearance. Counsel presented several letters from Mississippi lawyers attesting to Young's good reputation.
Young at first asserted that he was a victim of the scheme to defraud. Rather than readily agreeing to Lloyd's scheme and then attempting to conceal it, however, Young's obligation was to refuse to participate and attempt to put a stop to it by reporting it to the FBI or other authority empowered to investigate it.
Pursuant to Fed.R.App.P. 46(c) a court of appeals may "take any appropriate disciplinary action against any attorney who practices before it for conduct unbecoming a member of the bar." Based on Young's testimony in the Means case, the Court finds that Young engaged in conduct unbecoming a member of the Bar of this Court.
The Court has given due consideration to all of the mitigating circumstances presented by Young, including his admission of such conduct, his apology to the Court, his expressions of remorse, and his otherwise unblemished record.
Accordingly, the Court orders that Stanford Young be, and he is hereby, suspended from practice before this Court for a period of one year from the date of receipt of this Opinion and Order. The Clerk shall strike his name from the roll of attorneys admitted to practice before this Court. Stanford Young shall not resume practice before this Court until reinstated by order of this Court.
HAWKINS, Presiding Justice, specially concurring:
I concur with the majority.
It is also important that we fully grasp the environment in which Young operated.
*221 It is a matter of common knowledge to lawyers and citizens of this State who have had dealings with appointive state boards that these bodies do not operate as judicial proceedings. Persons who have matters pending before a state board, even contested matters, feel perfectly free to contact board members individually and solicit assistance. The Governor who appointed individual board members, and their personal friends are importuned for help. In short, blatant politics may, and no doubt often does enter into the decision making process.
And, one of the most fervid, hotly contested issues ever before any state board was an application for a new bank charter. I do not believe there is a banker in this state unaware of the intrigue, arm twisting and blandishments employed in such cases by both sides.
In this milieu it is not at all surprising to find shares of stock in a proposed bank have been offered to one or more individuals deemed close personal friends of a board member or the comptroller, in the hope, no doubt, it will have some effect on the ultimate decision. This can be expected when our state boards are operated in this manner.
As the majority notes, however, Young agreed to Lloyd's proposal with a view that Means, the comptroller himself, would also have a personal financial interest in the deal struck between Lloyd and the bank's promoters, and here Young clearly stepped over the line. Also, Young's testimony before a federal grand jury was considerably lacking in the probity required of any attorney when his own professional conduct has been called into question. Mr. Young is much too intelligent an individual to have been unaware he was committing grave professional misconduct.
I therefore concur in the decision of the majority.
DAN M. LEE and GRIFFIN, JJ., join this opinion.
NOTES
[1] Most states which have addressed the matter have held that disciplinary proceedings are not so criminal in nature as to evoke double jeopardy protections. In Re Disciplinary Action of George McCune, 717 P.2d 701, 707 (Utah 1986) (double jeopardy principles apply only in criminal cases, whereas bar disciplinary proceedings are civil in nature designed to maintain the honesty, integrity and professionalism of the bar.); In Re Matter of Pete Manuel Rubi, 148 Ariz. 167, 713 P.2d 1225, 1226 (1985) (principles of double jeopardy and double punishment do not apply to bar disciplinary proceedings in the strictest sense.); Fitzsimmons v. State Bar of California, 34 Cal.3d 327, 193 Cal. Rptr. 896, 667 P.2d 700 (1983) (Attorneys subject to disciplinary proceedings are not afforded all of the procedural safeguards which are extended to criminal defendants as they are sui generis as opposed to purely civil or criminal in character.); In The Matter of The Disciplinary Proceeding Against Anton Miller, 99 Wash.2d 695, 663 P.2d 1342 (1983) (Reconsider of order by disciplinary board was not precluded by double jeopardy under the state and federal constitutions.); In Re Harry Oxman and Ralph S. Levitan, 496 Pa. 534, 437 A.2d 1169 (1981) (Double jeopardy does not apply to disciplinary proceedings.); Hawkins v. State Bar, 23 Cal.3d 622, 153 Cal. Rptr. 234, 591 P.2d 524 (1979) (Affirmative defense of double jeopardy applies only in criminal actions and hence is inapplicable in a disciplinary proceeding.); Urbano v. State Bar, 19 Cal.3d 16, 136 Cal. Rptr. 572, 560 P.2d 1 (1977) (due process protections against multiple prosecutions in criminal cases do not apply in state bar disciplinary proceedings); Cocco v. Maryland Commission on Medical Discipline, 39 Md. App. 170, 384 A.2d 766, 769 (1978) (Actions before professional disciplinary boards are neither criminal nor civil and thus are not subject to the same protections as pure criminal prosecutions.); Maryland State Bar Association v. Frank, 272 Md. 528, 325 A.2d 718, 721 (1974) (Principles of double jeopardy and res judicata which bar certain criminal prosecutions are not a bar to disciplinary proceedings against an attorney.); Bluestein v. State Bar of California, 13 Cal.3d 162, 118 Cal. Rptr. 175, 529 P.2d 599, 91 A.L.R.3d 570 (1974) (An attorney's prior record may properly be considered in determining appropriate discipline for misconduct notwithstanding contention that such procedures violate constitutional proscriptions against double jeopardy and the doctrine of res judicata.).

The most thorough discussion in line with the holdings in the above cases was that in In Matter of Logan, 70 N.J. 222, 358 A.2d 787 (1976):
The respondent contends that the disciplinary process is equivalent to a criminal proceeding. But it is not. It is sui generis. In In Re Ries, 131 N.J.L. 559, 37 A.2d 417 (N.J. 1944) the court described the function of the proceeding:
But the proceeding is not criminal in nature. It is an exercise of the summary disciplinary jurisdiction of this court over attorneys and counselors, as officers of the court. (citations omitted) It is civil in character, or, perhaps, it is more accurate to say it is sui generis, for it partakes, essentially, of an inquiry to determine whether the delinquent practitioner is unworthy of the trust and confidence which attends the relationship of attorney and client. This is necessarily the basic consideration. The object of disciplinary proceedings is not alone to punish the attorney guilty of malpractice; the primary purposes are to compel the attorney to deal fairly and honestly with his client, and to determine whether he has, by his conduct, proved himself unfit to be trusted with the duties and responsibilities of the office of attorney. (citations omitted) If it is thereby evident that there is such deficiency of character as disqualifies him for the competence and trust inherent in the office, the public interests requires that he be ousted; and is wholly apart from any consideration of punishment. (citations omitted)
The purpose of a disciplinary sanction, whether it be a reprimand, suspension, or a disbarment, is not punishment, but maintenance of the integrity and purity of the bar, and elimination of unfit persons from the practice of law, and vindication of public confidence in the bar and administration of justice.
358 A.2d at 790.
In truth the disciplinary form of the bar resembles both civil and criminal processes in some respects:
The theoretical justification of the disciplinary form  protection of the public  and its inherent due process guarantees  are reminiscent of the criminal process. The potential loss of livelihood through disbarment is a more severe penalty than a misdemeanor fine, but it is less severe than total loss of liberty associated with a felony conviction.... The rules governing attorney discipline, however, are often far less precise than criminal statutes. Many of these rules have developed on a case by case basis over a long period of time. Moreover, the burden of proof is likely to be lower than than required for a criminal conviction, although it is often higher than that necessary in a civil suit. Martyn, "Lawyer Competence and Lawyer Discipline: Beyond The Bar?", 69 Geo.L.J. 705, 708-09 (1971).
[2] Rule 13, Rules of Discipline, MSB, effective January 1, 1984, is verbatim identical with the former statutory rule codified as Miss. Code Ann. § 73-3-341 (Supp. 1985). It matters not that Young's conduct and the proceedings before the Court of Appeals all took place before January 1, 1984, for the terms and provisions of the rule are the same whether found in Statutory Section 73-3-341 or Rule 13.
[3] In his brief Young refers repeatedly to statements attributed to federal prosecutors to the effect that, in their opinion, Young had committed no federal crime. The short answer is that we are not bound by any such statements. More fundamentally, our review of the Court of Appeals' opinion in Means and Young's testimony at the Means-Lloyd trial convinces us that the statements, if they were made, are quite incorrect.
[4] There are references in the brief filed on Young's behalf to the fact that any criminal prosecutions that may have been mounted against him are now time barred  a point decision of which we need not confront today. We do make clear that the findings made above, regarding Young's participation in activities defined as criminal by federal and state statutory law, are made for purposes of satisfying ourselves that the conduct relied upon by the Court of Appeals in its disciplinary action against Young is conduct proscribed by the Code of Professional Responsibility, Mississippi State Bar. See Disciplinary Rule 1-201(A)(1), (3), (4), (5) and (6). These findings shall have no force of effect in any criminal prosecution that may subsequently be brought and, specifically, they shall not be used as evidence against Young.
[5] In its opinion and order suspending Young, the Court of Appeals relies upon a second ground: that in his first appearance before the federal grand jury Young told "less than the whole truth." Without doubt, telling a federal grand jury deliberate falsehoods or less than the whole truth are grounds for bar discipline in this state. Holmes v. Mississippi State Bar, 498 So.2d 837 (Miss. 1986); Mississippi State Bar v. Nixon, 494 So.2d 1388 (Miss. 1986). But in the present state of the record we have no clear focus upon the exact nature and substance of Young's sin in this regard. Young admits that in his second grand jury appearance he told "the facts as they really were." Yet nowhere are we told precisely what was omitted or misrepresented before the first grand jury nor what was added or corrected before the second. For these reasons, we exercise our inherent de novo authority in bar disciplinary matters and for the moment decline to take any action against Young by reason of his grand jury testimony, notwithstanding the May 16, 1983 order of the Court of Appeals and our authority by virtue of Rule 13/Section 73-3-341.
[6] Reinstatement shall be governed by Rule 12.4, Rules of Discipline, Mississippi State Bar.