779 P.2d 1268

**In the Matter of a Member of the State Bar of Arizona, Charles R. HOOVER, Respondent.**

**No. SB–88–0029–D.**

Supreme Court of Arizona,
In Banc.

July 28, 1989.
As Amended Oct. 4, 1989.

Beer & Toone, P.C. by Paul Beer and Warner, Angle, Roper & Hallam by Jerry L. Angle, Phoenix, for respondent.

Harriet L. Turney, Chief Counsel, Phoenix, State Bar of Arizona.

FELDMAN, Vice Chief Justice.

This case comes before us for final disposition following a previous hearing and remand to the Disciplinary Commission. *See In re Hoover*, 155 Ariz. 192, 745 P.2d 939 (1987) (*Hoover I*). Our jurisdiction over bar discipline is based on provisions of the Arizona Constitution, inherent authority, and procedural rules.[1]

## FACTS

*Hoover I* sets forth the facts in detail. Respondent, a respected and successful attorney, suffers from bipolar manic depressive psychosis, which presently is in remission. While under pressure and work-

---

1. Ariz. Const. art. 3 (separation of powers); art. 6, § 1 (integrated judicial department); *id.*, § 5(5) (rule making authority); *In re Bailey*, 30 Ariz. 407, 411–14, 248 P. 29, 30–31 (1926) (supreme court, as independent department of government, has inherent and ultimate authority to regulate the admission and disbarment of attorneys); Rules 31, 41, 46, 51–53, Ariz.R.Sup. Ct., 17A A.R.S.; *see also In re Day*, 181 Ill. 73, 84–86, 54 N.E. 646, 649–51 (1899) (describing authority to admit and disbar attorneys passing from Edward I of England to his justices in 1292 and continuing to the present day judiciary).

ing on a large real estate transaction, respondent misappropriated substantial sums from his client and fraudulently billed for personal expenses. The psychiatrists concluded with essential unanimity that, at the time of his misconduct, respondent suffered from the psychosis and his misconduct was a product of that disease. They believed he was *M'Naghten* insane at the time, so that he either did not know right from wrong, the nature and quality of his acts, or both. *Hoover I*, 155 Ariz. at 194, 745 P.2d at 941. The Local Hearing Committee (Committee) (*see generally* Rule 48, Ariz.R.Sup.Ct., 17A A.R.S.)[2] adopted this testimony. *See* Findings of Fact, Conclusions of Law, and Recommendations (hereafter Committee Report), filed May 29, 1986, Findings of Fact, Nos. 8 and 9. The Committee recommended no discipline, but recommended certain rehabilitative measures under Rule 59 while maintaining respondent's active status.

On review, the Disciplinary Commission (Commission) (*see generally* Rule 47) disagreed with the Committee's recommendation that the matter be converted from a disciplinary proceeding to a disability proceeding, apparently disagreed with the Committee's conclusion that *M'Naghten* insanity was a defense to professional discipline, and remanded the matter for a hearing before a new committee. Pursuant to Rule 55(i), respondent petitioned this court to review the Commission's order. We held that we had jurisdiction to grant review, and on so doing, further held that:

1. The Commission's remand for a *de novo* hearing before a new committee was improper and violated both the scope of the Commission's powers and respondent's right to procedural due process. *Hoover I*, 155 Ariz. at 197, 745 P.2d at 944.

2. The Committee has authority under the governing rules to "convert" a disciplinary proceeding into a disability proceeding and to combine the procedures provided by these two methods of addressing attorney misconduct. *Id.*

3. Disciplinary and disability proceedings could commence simultaneously, thus making both remedy regimens available. *Id.* at 197, 199, 745 P.2d at 944, 946.

4. On these facts, *M'Naghten* insanity was a matter that must be considered in mitigation of bar discipline but was not a complete defense to the imposition of disciplinary sanctions for attorney misconduct. *Id.* at 198–99, 745 P.2d at 945–46.

We vacated the Commission's order for a *de novo* hearing and remanded the case to the Commission for further proceedings. Those proceedings having been completed, the Commission has filed its report and recommendations with this court. The Commission unanimously adopted the Committee's significant factual findings.[3] It then recommended by a vote of five-to-three that despite the Committee's finding of *M'Naghten* insanity, respondent should be disciplined by suspension for a period of six months and one day and should not be reinstated except on certain terms and conditions. The Commission also recommends that respondent be placed on "probation" during the period of suspension. Respondent filed a timely notice of appeal from the report of the Commission (*see generally* Rule 53(e)), and the matter is now before us for final disposition.

### THE *M'NAGHTEN* ISSUE

■ Citing the fact that respondent's mental condition would constitute a complete defense had he been charged with a crime,[4] respondent argues that the imposi-

---

2. The procedural rules currently in effect govern these proceedings, but former Rule 29(a) (Code of Professional Responsibility) governs the substantive aspects of this case. *Hoover I*, 155 Ariz. at 193 n. 1, 745 P.2d at 940 n. 1. Hereafter, we cite the current supreme court rules as "Rule —" and the former rules as "former Rule —."

3. Although eight Commissioners were present for oral argument, deliberation, and the vote on

the Commission's final recommendation, only seven Commissioners were present for the vote on the Commission's findings and conclusions.

4. Some evidence shows that respondent's mental condition constituted a complete defense to criminal charges. So far as this record shows, despite respondent's admission of misconduct, no criminal charges have been filed.

tion of bar discipline would violate his right to equal protection of the law. We disagree. In *Hoover I*, we stated the following with respect to this question:

In our view, bar discipline is not foreclosed merely because the ethical impropriety was the product of a mental illness. On the other hand, although insanity does not foreclose discipline, it must be considered in determining whether and what kind of discipline is to be imposed and what procedures are to be followed to protect the public.

We reach this conclusion for two interrelated reasons. First, the *M'Naghten* standard is not a medical diagnosis, but a legal fiction developed for courtroom use ... as a test for the intent necessary to hold a defendant criminally responsible.... Its use today, almost 150 years after *M'Naghten's Case* was decided, has been severely and aptly criticized. We see no need to engraft such a test onto bar discipline proceedings which are not intended to punish.

155 Ariz. at 198–99, 745 P.2d at 945–46 (citations omitted).

We reaffirm these views. A finding of *M'Naghten* insanity is a complete defense to crime. *See* A.R.S. § 13–502. In criminal cases, history ties us to the concepts announced 146 years ago in *M'Naghten's Case*, 10 Clark & Fin. 200, 8 Eng.Rep. 718 (1843), even though those standards have little if any meaning in the modern medical world. The medical profession does not recognize *M'Naghten* insanity as a condition or illness. *See generally* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (3d ed. rev. 1987). It is only when psychiatrists and psychologists communicate with lawyers that they recite the *M'Naghten* incantation.

■ Although our history may compel us for now to employ *M'Naghten* as the test for the propriety of imposing punish-

ment for crime, it does not require us to do so when considering whether to sanction an attorney for violation of lawyers' ethical precepts. Indeed, the vast majority of cases considering this issue hold that bar discipline may be imposed on lawyers with various degrees of mental illness and disturbance. *See* Annotation, *Mental or Emotional Disturbance as Defense to or Mitigation of Charges Against Attorney in Disciplinary Proceeding*, 26 A.L.R. 4th 995 (1983). Mental disease or illness, even when psychiatrists can be found to characterize it as *"M'Naghten* insanity," is not a per se bar to imposing sanctions on a lawyer for ethical violations.[5]

■ Nor do we believe imposing bar discipline on a lawyer when he was not or could not have been convicted of a criminal offense for the same conduct implicates, let alone violates, the equal protection clause. Bar and judicial discipline proceedings are neither penal in objective nor criminal in nature, and discipline may be imposed in manners that would be constitutionally impermissible in a criminal case. *See In re Marquardt*, 161 Ariz. 206, 214–215, 778 P.2d 241, 249–250 (1989); *Gary v. State Bar of California*, 44 Cal.3d 820, 826, 749 P.2d 1336, 1340, 244 Cal.Rptr. 482, 485–86 (1988) (upholding application of enhanced disciplinary sanctions to attorney's conduct occurring after the promulgation of the standards, even though *ex post facto* principles would have prohibited such application in a criminal case); *In re Barclay*, 82 Utah 288, 24 P.2d 302, 303–04 (1933) (upholding "prosecution" of attorney for misconduct committed prior to state bar's organized existence); *In re Brown*, 157 W.Va. 1, 7, 197 S.E.2d 814, 818 (1973) (upholding imposition of interim sanction for attorney misconduct even though that sanction was first adopted subsequent to the conduct giving rise to the disciplinary proceedings).

We do not hold that constitutional concepts such as due process and equal protec-

---

5. Of course, when an attorney suffers from a mental disturbance such that he cannot perceive reality at all or lives in a fantasy world totally divorced from reality, the mental condition may be a complete defense to bar discipline. *See*

Annot., *supra,* at 1006 n. 14. But that is not the case here. Respondent knew he was taking trust monies and showed some creativity in concealing his actions from easy discovery.

tion are inapplicable to bar proceedings. *Hoover I* recognizes the contrary. 155 Ariz. at 196–97, 745 P.2d at 943–44. We hold simply that respondent is not deprived of equal protection of the law simply because he, as with other attorneys, is subject to bar discipline for conduct that could not have formed the basis for criminal prosecution. Given the difference in objectives between bar discipline and criminal prosecution, the application of different standards of *mens rea* in the two proceedings violates neither equal protection nor due process principles.

■ Moreover, application of equal protection principles does not invalidate imposition of bar discipline here. State discrimination between different classes of individuals is permissible as long as the classification serves a legitimate interest and the classification rationally furthers that interest. *Kenyon v. Hammer*, 142 Ariz. 69, 78, 688 P.2d 961, 970 (1984). A classification rationally furthers the interest unless it " 'rests on grounds wholly irrelevant' " to the legitimate interest. *Id.* (quoting *McGowan v. Maryland*, 366 U.S. 420, 425, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961)).[6] Here, the legitimate interest is to protect the public from harm at the hands of dishonest or disabled lawyers, to foster professional integrity, and to maintain the public's confidence in the organized bar as a whole. Disallowing *M'Naghten* insanity as a complete defense in discipline-disability proceedings is quite relevant to these ends.

## SUFFICIENCY OF THE EVIDENCE

■ The state bar argued in *Hoover I* that the evidence before the Committee did not support a finding of *M'Naghten* insanity. We did not review the evidence at that time. *See* 155 Ariz. at 198, 745 P.2d at 945. Three mental health experts testified at the Committee hearing. All agreed that respondent was psychotic and *M'Naghten* insane at the time of his conduct, and that his

improper conduct was the result of mental illness. The Committee unanimously accepted this evidence in its findings. Every Commission member voting on this issue agreed with the Committee's findings. Clear and convincing evidence supports these findings. *See* Rule 54(c).

Bar counsel implies that we should disregard the testimony and as independent finders of fact conclude that respondent was neither *M'Naghten* insane nor psychotic. We reject the invitation. Little or nothing exists in the record on which to base such a finding. We do not believe the fact that a lay witness noticed nothing unusual about respondent's demeanor is a substantial basis on which to reject the unanimous testimony of every mental health expert. It has long been our rule that we will defer to the factual findings of those who have heard the testimony. *In re Pappas*, 159 Ariz. 516, 518, 768 P.2d 1161, 1163 (1988); *In re Stone*, 80 Ariz. 216, 220, 295 P.2d 839, 841 (1956) (local committee's factual findings "should be given very serious consideration"). The dissent points out no reason why, in this one case, at this one time, we should abandon a rule followed for many years. If we reached such a conclusion, it would be based on nothing but our own preconceived ideas or prejudices, not clear and convincing evidence.

Accordingly, we accept the findings that respondent was psychotic and even *M'Naghten* insane. However, as we have noted, the *M'Naghten* standard is a legal fiction developed as a test for *mens rea* and not a medical diagnosis. *See supra; Hoover I*, 155 Ariz. at 199, 745 P.2d at 946. Thus, to determine the appropriate remedy and the mitigating effect of respondent's mental condition, we disregard the legal fiction—*M'Naghten*—and consider only the medical diagnosis of bipolar manic depressive psychosis.

## APPROPRIATE REMEDY

In *Hoover I* we permitted the matter to proceed as a joint disciplinary-disability

---

**6.** Of course, this rational basis test does not apply if the classification burdens a suspect class or impinges on a fundamental right. Lawyers are not a suspect class within the meaning

of equal protection jurisprudence. Neither is the right to practice law a fundamental right. *See In re Moore*, 453 N.E.2d 971, 972–73 (Ind. 1983).

proceeding, expressly noting that respondent may be sanctioned, put on disability status, or both. 155 Ariz. at 199, 745 P.2d at 946. The Committee converted the disciplinary proceedings into disability proceedings. It then recommended respondent remain on active status, but under specified terms and conditions. *See* Committee Report, *supra* (Recommendations). Although no rule specifically provided for such procedure, we held the Committee had the authority to fashion a just remedy to the particular circumstances of the case. 155 Ariz. at 197, 745 P.2d at 944.

### A. Reinstatement Considerations as Affecting the Sanction to be Imposed

On remand from this court, the Commission rejected the Committee's conversion of the proceedings and as a disciplinary sanction recommended suspension for six months and one day, plus probationary terms similar to those the Committee recommended. *See* Commission Report, filed April 12, 1988 (Recommended Sanction). When questioned at oral argument about the unusual nature of the six months and one day recommendation, bar counsel candidly acknowledged that the evident purpose of the Commission's recommendation was to ensure that respondent could be reinstated only under the protracted procedures required under Rule 72, the general reinstatement rule, rather than under either Rules 71 or 73. Under Rule 71, a lawyer suspended for six months or less may be reinstated on filing of an affidavit containing the information prescribed in Rule 71(c). Rule 73 allows for reinstatement after transfer from disability-inactive status and may be accomplished by the filing of an application and proceedings (both as specified under Rule 72) establishing "that the lawyer's disability has been removed and he is fit to resume the practice of law." *See* Rule 73(a) and (c).

■ We do not believe it appropriate to allow concerns about reinstatement procedures to affect the ultimate conclusion as to the proper length or type of sanction. Respondent has continued to practice during the pendency of these proceedings, but under conditions we prescribed in *Hoover I. See* 155 Ariz. at 199, 745 P.2d at 946. Bar counsel has not advised us of any breach of these conditions, nor of any violations by respondent during the two years since he was permitted to resume practice. Therefore, we assume that respondent continues to obtain psychiatric consultation and therapy as appropriate. We assume further that regular reports have been filed with chief bar counsel as *Hoover I* requires. *See id.* Thus, experience shows that the probationary scheme utilized in this case is effective. Consequently, the rigorous reinstatement procedure outlined in Rule 72 is unnecessary. We now consider whether we should suspend respondent from the practice of law according to the Commission's basic recommendation.

### B. Necessity of Suspension

■ Respondent argues that suspending a lawyer whose misconduct was caused by a mental disease over which he had no control serves no worthwhile purpose. Manic depressive diseases generally are considered to be caused by a chemical imbalance in the body, and many physicians treat the disease by administering lithium carbonate to restore the proper balance.[7] *See* Reporter's Transcript (RT), March 27, 1986, at 142. Respondent contends that imposing a severe sanction such as suspension will do nothing to deter others who suffer from manic depressive psychosis from engaging in improper conduct caused by a mental disease over which they have no control. This may be true. *See In re Kersey,* 520 A.2d 321, 327 (D.C.1987).

However, it is also true that another objective of bar discipline is to give the public confidence in the integrity of the bar and its ability to impose sanctions on those committing serious transgressions. *Hoover I,* 155 Ariz. at 199, 745 P.2d at 946; *In re Stout,* 122 Ariz. 503, 504, 596 P.2d 29, 30

---

7. In this case respondent's psychiatrist did not prescribe this standardized treatment. Reporter's Transcript, March 27, 1986, at 199. We draw no negative inference from this fact, however.

(1979) (cause of attorney misconduct is secondary to the bar's duty to protect the public interest). In our view, mental disease or not, this respondent committed serious transgressions. One can suffer from manic depressive disease without stealing from one's clients, so we cannot say that no element of blame should attach to this respondent. Further, we have difficulty accepting the argument that a lawyer, while effectively managing and closing a multimillion dollar real estate transaction, can misappropriate funds, defraud his clients, conceal his defalcations, and then escape sanctions by claiming he was unaware of what he was doing or could not appreciate the impropriety of his conduct. None of the mental health experts indicated that this respondent suffered from delusions so severe he was unaware of the implications of his conduct. *See* RT, March 27, 1986, at 135, 190, 220, 232 (testimony of Gregory Crow, Ph.D., Robert Shapiro, M.D., and Otto Bendheim, M.D.);[8] *cf.* Annot., *supra,* at 1006 n. 14.

In our view, therefore, disciplinary sanctions are appropriate. We accept and approve the essence of the Commission's recommendation and suspend respondent for a period of six months, effective sixty days from the date this opinion is filed. We allow this lag time for the benefit of respondent's clients and respondent himself, so he may make suitable arrangements for his files to be handled during the period of his suspension. We emphasize that in determining the length of the suspension, we have considered the mitigating effect of the mental illness that contributed to respondent's improper conduct. If not for the record establishing the diagnosis of bipolar manic depressive psychosis, the appropriate sanction for misappropriation of clients' funds normally is disbarment. *In re Campbell,* 108 Ariz. 200, 201, 495 P.2d 131, 132 (1972); ABA, *Standards for Imposing Lawyer Discipline,* Standard 4.11 (1986) (hereafter Standards).

For several reasons, a longer period of suspension or disbarment is inappropriate. First there is respondent's previous record, which includes many different areas of service to the bar and the community. Second, there exists the fact that the improper acts were the result of a serious, diagnosed mental illness that respondent was unable to control. Third, restitution has been made. Fourth, respondent's clients, including those damaged by his conduct, do not favor imposition of discipline. Fifth, two years have passed without further incident or problem since respondent was permitted to resume his practice under the conditions we imposed in *Hoover I.* It appears respondent has been able to resume life as a productive member of society. Finally, no member of either the Committee or the Commission has recommended on the record anything more than a six-month suspension. In view of these considerations, a disbarment or long suspension would accomplish nothing more than the needless destruction of respondent's career. The six-month suspension, the requirement for reinstatement proceedings (*see infra*), and the probationary term and conditions adequately balance the competing interests present here: we inform the public and the bar of our firm resolve to impose sanctions on those who violate ethical standards, we protect the public from further harm, and we help in rehabilitating respondent so he may continue to contribute to society.

## C. Necessity of Probation after Suspension

Because respondent is not cured, and his manic depressive disease is only in remission, we place respondent on probation, beginning after his suspension ends, for an initial two-year period as provided in Rule 52(a)(6)(A). His probation terms are as follows:

1. During his probation respondent shall continue regular consultation with a

---

**8.** Although all the experts agreed respondent could not control his conduct nor appreciate the negative consequences of his actions (*e.g.,* ethics charges and possible criminal charges), Dr. Bendheim testified respondent knew his financial machinations would be detected by his law firm's internal audit procedures. RT, March 27, 1986, at 231–32. Thus, respondent suffered no delusions about what he actually was doing.

psychiatrist or a psychologist whose name, address, and telephone number shall be furnished to the chief bar counsel of the Arizona state bar.

2. During his probation respondent shall cause his attending psychiatrist or psychologist to file a report of respondent's condition with chief bar counsel not less than every ninety days during the first twelve months of the probation period, and not less than every six months during the final twelve-month period, together with a statement that respondent continues to receive regular care and consultation.

3. If respondent suffers a recurrence of his mental disability at any time during the probation period, or fails to continue regular consultation as ordered, the state bar may request that the Commission reopen these proceedings to determine whether other or further action should be taken, including, without limitation, that the terms of probation be appropriately modified, that respondent should be placed on disability inactive status pursuant to Rule 59(b), or for such other proceedings as may be appropriate.

4. The period of probation shall commence immediately upon respondent's reinstatement from suspension. The probationary period shall run for two years, subject to extension as provided for in Rule 52(a)(6)(A).

### D. Reinstatement

If and when respondent seeks reinstatement, he may do so under the provisions of Rule 71(c). On any such application, we expect respondent will establish that he has complied with the probationary terms for the six-month period he was under actual suspension. We note the rule gives the Commission an opportunity to respond to respondent's request for reinstatement. If the circumstances are such that during the period of actual suspension the terms of probation become ineffective to protect the public interest, we expect the Commission to raise the issue when respondent seeks reinstatement. If the Commission does so, the rule continues respondent's suspension until further order of this court. We will then either devise further probationary terms or take any other action appropriate to the situation.

### CONCLUSION

The report and recommendations of the Commission are accepted and approved except as modified in this opinion. It is the judgment of the court that respondent violated the provisions of DR 1–102(A)(1), (A)(4), and (A)(6) (former Rule 29(a)) and that disciplinary sanctions are permitted and required under the facts of this case, respondent's mental condition at the time of his misconduct notwithstanding.

Accordingly, we suspend respondent for a period of six months, effective sixty days from the date on which this opinion is filed. He may apply for reinstatement at the time permitted by the rules. Reinstatement may be sought under Rule 71(c) and the procedures prescribed therein. If reinstated, respondent will serve a two-year probationary term after the term of suspension ends. We contemplate that during the suspension period respondent will continue to consult with his physicians and that they will continue to provide the state bar with reports on his condition and progress. Of course, we will order respondent's reinstatement, if at all, only on such further conditions [9] as are necessary to ensure the protection of the public.

Respondent also is assessed costs incurred by the bar in the amount of $5,600.80.

GORDON, C.J., and SCHNEIDER, Maricopa County Superior Court Judge, concur.

CAMERON and MOELLER, JJ., did not participate in this decision; pursuant to Ariz. Const. art. 6, § 3, ROLL, Judge of the Court of Appeals, Division Two, and BARRY SCHNEIDER, Judge of the Maricopa County Superior Court, were designated to sit in their stead.

---

9. *See* Rule 52(a)(6); Standards, *supra,* § 2.7 and Commentary.

CORCORAN, Justice, dissenting:

I respectfully dissent. We have before us a criminally insane lawyer who for personal gain knowingly and creatively stole substantial sums from his client and fraudulently billed for expenses.

To protect the public, to retain whatever confidence the public and Bar have in Bar disciplinary proceedings, and to foster professional integrity in the Bar, respondent should be disbarred.

ROLL, Judge of the Court of Appeals, concurring with Justice CORCORAN's dissent and separately dissenting.

Between January and June, 1984, by his own admission, attorney Charles R. Hoover misappropriated in excess of $61,000. The thefts were made possible by the making of false entries in his law firm's time-keeping system and by disguising his personal expenses as business costs. Hoover maintains that he was psychotic during this period of time. Hoover was not prosecuted for the misappropriation.

Psychiatric testimony in support of Hoover's claim indicated that he suffered from a bipolar disorder.[10] This condition, previously referred to by the American Psychiatric Association as a manic-depressive disorder, was atypical because Hoover only suffered from manic and not depressive cycles.

While Hoover was allegedly psychotic, he was engaged in complicated contract negotiations on behalf of the client his law firm was representing. Although conflicting evidence from lay witnesses existed, some lay witnesses testified that Hoover demonstrated no unusual or bizarre behavior during the time frame in which the misappropriation occurred. Accordingly, I believe that the evidence that Hoover was psychotic is far from persuasive.

The supreme court is the ultimate trier of law and fact in a determination regarding the appropriate discipline to be accorded an attorney who has engaged in misconduct. *In re Douglas*, 158 Ariz. 516, 517,

764 P.2d 1, 2 (1988); *In re Kleindienst*, 132 Ariz. 95, 99, 644 P.2d 249, 253 (1982). There is precedent for disbarment as a sanction for the misappropriation of a client's funds. *In re Davis*, 129 Ariz. 1, 4, 628 P.2d 38, 41 (1981) (attorney misappropriated $5,600); *In re Moore*, 110 Ariz. 312, 315, 518 P.2d 562, 565 (1974) ($71,000 diverted and commingled); *In re Campbell*, 108 Ariz. 200, 495 P.2d 131 (1972) (attorney misappropriated $4,500).

I agree with Justice Corcoran that public confidence in the State Bar of Arizona requires that Charles Hoover be disbarred. I also believe that his disbarment is required in order to fortify the perception of members of the bar that discipline is imposed in an even-handed and equitable fashion regardless of the stature of the attorney.

For the above-stated reasons, I believe that disbarment is appropriate.

---

**10.** *Diagnostic and Statistical Manual of Mental Disorders* at 225 (3d ed. revised 1987).